IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: RYAN JAMES ROGGASCH,                              CASE NO.  4:11-bk-17505M
                                                        (CHAPTER 7)
     Debtor.

TASHA AND JOHN SIMS                                      PLAINTIFFS

VS.                                    4:12-ap-01034

RYAN JAMES ROGGASCH                                      DEFENDANT


<u>MEMORANDUM OPINION</u>

     This matter comes before the Court on the complaint of Tasha Sims (Sims) and John Sims (Plaintiffs) to have Ryan James Roggasch's (Debtor) debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2).  The complaint also objects to the Debtor's discharge pursuant to the provisions of 11 U.S.C. § 727(a)(2) and 11 U.S.C. § 727(a)(6).  Trial on the merits was held in Little Rock, Arkansas, on September 13-14, 2012 and the matter was taken under advisement.  The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) and the Court has jurisdiction to enter a final judgment in this case.  The following shall constitute findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

I.

<u>THE FACTS</u>

     The Debtor is a resident of Benton, Arkansas, and during all times relevant to these proceedings was president and sole shareholder of Elite Homes of Arkansas, Inc.

1

Sims testified that she was introduced to the Debtor by a mutual friend Eddie Taheta (Taheta) in the fall of 2005.  According to the Debtor's testimony, he first met Sims with Taheta at her office downtown where they discussed the construction of a home.  (Tr. at 356.)  At this meeting, Sims told the Debtor that she wanted to build a house and that she needed a general contractor.  She stated that she also immediately asked the Debtor how old he was and what experience he had and how many houses had he built.  She said the Debtor told her he was 26 or 27, she did not remember exactly.  She recalled that he represented that he had built between 25-30 houses or six or seven houses a year since he was 21 or 22.  She stated that during that first meeting she asked the Debtor if he was "insured and bonded and had all of his licenses and everything."  (Tr. at 174.)  The Debtor responded that he had everything that was needed to build a house.  She specifically recalled that she stated to the Debtor,

> And I said, "Let me ask you this," and I said - - I leaned across the table, and I said, "Not that I think that you're going to do a bad job or anything, but there's been so many people out here that have had so many problems building houses." I said, "Do you have workman insurance, so that if you do something wrong with the house, it is going to be fixed?" And he said, "Yes."  And I said, "So," I said, not that I think you're going to do anything wrong, I'm sure you're a good contractor, I'm sure there won't be a problem."  He said, "I treat all of my clients like family."  He said, "I bend over backwards for them.  I am there.  I will do whatever has to be done.  And I do have insurance, so that if there's some kind of workmanship issue, it would be covered."

(Tr. at 174-175.)

The Debtor recalled Sims asking if he had the necessary license and insurance to build a house and he stated that he did.   He said there was no discussion of a builder's risk policy at the meeting but that it was discussed later on.  (Tr. at 357.)  According to the Debtor, when it came up later, he stated that, "It was not possible for us to be able to provide a builder's risk policy"

2

because he was not the owner of the property and did not have a mortgage on the property. (Tr. at 357-358.) He said he never told Sims he had workmanship insurance and the issue of being bonded was never discussed.

Later, at the end of September 2005, after Sims and her ex husband had sold a previous residence, Sims met with the Debtor a couple more times and they reached an agreement for the Debtor to build her a house. (Tr. at 180-181.) The agreement was reduced to a two-page written contract between Elite Homes of Arkansas, Inc. and Tasha Dailey (Sims' last name at that time was Dailey) dated November 22, 2005. (Def. Ex. 1.) The contract is an unsophisticated two-page typewritten document which contained a sketchy outline whereby Elite Homes of Arkansas, Inc., was to oversee the construction of a home for Sims according to "specs and blueprints" provided by Sims. Elite Homes of Arkansas, Inc., was to receive $20,000.00 for overseeing the project. The contract estimated the start date of construction to be November 24, 2005, and a completion date of March 24, 2006. Materials purchased during construction were to be paid in full at the billing due date. The contract called for a $10,000.00 deposit and the balance of the contractor's fee of $10,000.00 due upon completion. The written contract did not state the cost to be paid for the project but stated that the contract was a "cost plus contract."

The Debtor said the price was not discussed at the first meeting because Sims did not yet have a set of plans. Subsequently, Sims produced a set of plans and after reviewing the plans the Debtor came up with an estimated construction cost. (Tr. at 361.) The estimated construction cost was reduced to writing and totaled $231,708.42. (Def. Ex. 6; Tr. at 361.) The Debtor stated that he reviewed the estimated construction cost with Sims and Sims said the cost was too high so the Debtor re-figured the cost and lowered the contractor's fee from $35,000.00 to $20,000.00

3

which resulted in the estimated construction cost to be $216,708.34.  (Def. Ex. 6; Tr. at 364.)  He said this occurred before the contract was signed.

Sims testified that the bank required the Debtor's insurance information and contractors licence before she could start receiving draws on her construction loan; therefore, when she was authorized for draws, she assumed the Debtor provided the bank with the necessary documents. (Tr. at 182.)  Based on information from the bank, Sims estimated that her house payment would be $1,200.00 to $1,300.00 per month.  (Tr. at 183.)

There were marks on the contract next to the electrical, painting and floor covering categories which were made by Sims identifying items she or family members would take care of in an effort to reduce the cost.  (Def. Ex. 1; Tr. at 364.)  The Debtor stated that Sims had a subcontractor do the electrical work and that she did the painting and floor work herself.  (Tr. at 365.)

As construction progressed, bills were sent to the Debtor and he would present them to Sims for payment.  (Tr. at 368.)  The construction was not completed by the estimated completion date and the quality of work was not satisfactory to the Debtor.  There was substantial evidence that the quality of the construction work was extremely poor.  The Debtor stated that one of the reasons was as construction progressed, Sims made changes to his original plans.

The Debtor was terminated in July of 2006 by Sims who then hired a different builder to finish the construction of the house.  In February 2007 she obtained long-term financing.  (Tr. at 213.)  She stated that the home is still not satisfactory to her.  (Tr. at 213.)  She opined that the "house probably needs to be dozed down and started over again.  When the winds and the rains

4

came through last week, there was literally water dripping down both the inside and outside wall that is covered." (Tr. at 215.)

Sims stated that at the time she had to discharge the Debtor she had gone through the $235,000.00 construction loan. (Tr. at 183 & 212.) She testified that she had to borrow more from the bank to complete the house. (Tr. at 184 & 212.) She also testified that she borrowed $10,000.00 to $12,000.00 from her mother, and $8,000.00 to $10,000 from her father. (Tr. at 212.) She repaid her mother and said her final mortgage amount was $350,000.00 and her current mortgage payment is $2,794.00 per month. (Tr. at 183-184.) However, Sims never introduced any documents to corroborate any of this testimony.

On September 20, 2008, Sims and her new husband, John Sims, filed a complaint in the Circuit Court of Saline County, Arkansas, against Elite Homes of Arkansas, Inc., and later amended the complaint on August 12, 2009, to include the Debtor individually as a co-defendant.[1] (Pl. Ex. 1A & 1D.) The complaint alleged that the Debtor was in breach of contract and breach of implied warranties and the Debtor built Sims' home in a negligent manner thereby causing damage as alleged in the original complaint of $33,191.59 plus interest and attorney's fees. The complaint also alleged that the Debtor misrepresented that he had insurance that covered "negligent workmanship" and that he, in fact, had no such insurance which was an unconscionable false and deceptive trade practice in violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101, et seq., and therefore the Debtor should be jointly liable for damages proximately caused by negligent workmanship and failure to maintain the

---

[1]Her current husband, John Sims, was a hunting friend of the Debtor's. The Debtor helped arrange John's introduction to Sims. (Tr. at 430-431.)

5

insurance to cover the negligent workmanship.  (Pl. Ex. 1D.)

Trial on the merits was held in the Circuit Court of Saline County, Arkansas, in March 2011 before a jury which returned a verdict in favor of the Plaintiffs against the Debtor on the following grounds:

1.      Breach of contract;

2.      Breach of implied warranties;

3.      Negligence;

4.      Violation of Arkansas Deceptive Trade Practices.

The jury assessed damages against the Debtor and Elite Homes of Arkansas, Inc., in the sum of $140,000.00, but did not allocate the damages to any of the four specific legal theories advanced by Plaintiffs.  Thereafter, on June 20, 2011, judgment was entered in favor of Sims and John Sims against the Debtor and Elite Homes of Arkansas, Inc., jointly and severally, for the sum of $140,000.00 plus pre-judgment interest of $58,464.00, costs in the amount of $780.00, attorney's fees of $10,000.00 for a total judgment of $209,244.00 plus interest on said judgment from the date of its rendition at the rate of 10% per annum.

On July 21, 2011, the Debtor and Elite Homes of Arkansas, Inc., filed a notice of appeal to the Arkansas Court of Appeals.  (Pl. Ex. 2B.)  The appeal was still pending when the Debtor filed a voluntary petition for relief under the provisions of the Chapter 7 of the United States Bankruptcy Code on November 22, 2011.

On March 5, 2012, Plaintiffs filed a complaint in this proceeding objecting to the Debtor's discharge and dischargeability of the Debtor's debt.

The Plaintiffs allege in Count I, paragraph 14:

6

> The Defendant with the intent to hinder, delay or defraud a creditor, has transferred, removed, destroyed, mutilated, or concealed, or has permitted the transferred, removed, destroyed, mutilated or concealed property of the debtor, within one year before the date of the filing of the petition. 11 U.S.C. § 727(a)(2).

In Count I, paragraph 15, the Plaintiffs allege that, "The Defendant has refused to obey the automatic stay. 11 U.S.C. § 727(a)(6)." Also in Count I, paragraph 16, the Plaintiffs allege that, "The Defendant currently receives unaccounted for benefits from the corporation he transferred to his manager. 11 U.S.C. § 727(a)(2)." Count II, paragraphs 19, 20 and 21, the Plaintiffs allege that because the Defendant was found guilty of violating the Arkansas Deceptive Trade Practices Act, the Defendant's debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2).

At the conclusion of the Plaintiffs' case in chief, the Debtor moved for judgment as a matter of law as to all of the allegations in the complaint. The motion was granted by order entered October 23, 2012, as to the allegations contained in Count I, paragraphs 15 and 16 and denied as to the allegations in paragraphs 14 and Count II, paragraphs 19-21.

## II.

## ARGUMENT

The Plaintiffs argued at trial and in their brief that the Debtor intentionally made false misrepresentations with the intent to deceive Plaintiffs and the false misrepresentations resulted in injury to Plaintiffs represented by the debt sought to be determined to be nondischargeable. Specifically, Plaintiffs argue that the Debtor misrepresented his age, that his work was covered "under insurance and bond," that he misrepresented his experience, and the type and quality of homes he had built, and that he was going to use a particular type of waterproofing product. The complaint in this adversary proceeding only alleged violation of the Arkansas Deceptive Trade

Practices Act.[2]

The third argument Plaintiffs make is that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2) because the Debtor transferred his stock in Eighty Eight Cabinets, a corporation he owned, with the intent to defraud creditors within one year of the date the petition was filed.

III.

11 U.S.C. § 523

11 U.S.C. § 523(a)(2)(A) provides as follows:

> A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services . . . to the extent obtained by - false pretenses, a false representation, or actual fraud. . . .

The Plaintiffs have the burden of proving by a preponderance of the evidence that this claim fell within the U.S.C. § 523(a)(2)(A) exception to discharge.  Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 660 (1991); Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 637 F.3d 855, 860 (8th Cir. 2011).  To prove nondischargeability under 11 U.S.C. § 523(a)(2)(A), the evidence must show:

(1) the debtor made a representation, (2) with knowledge of its falsity, (3)

---

[2] The complaint filed by the Plaintiffs made only one specific allegation of fraudulent misrepresentation which was that the Debtor "had both bond and insurance for workmanship."  Except for this allegation the complaint failed to allege fraud as a basis for liability with specificity as required by Federal Rule of Bankruptcy Procedure 7009.  However, evidence of the other two alleged misrepresentations was admitted without objection therefore the pleadings are amended to conform to the proof because the issue was tried by implied consent.  See In re Cooper, 399 B.R. 637 (Bankr. E.D. Ark. 2009) & Fed.R.Bankr.P. 7015(b)(2).  The Court notes that the Debtor did object to allowing the Plaintiffs to amend the pleading to conform to the proof, but that was in regards to section 727 and not section 523.  That objection was overruled.

8

deliberately for the purpose of deceiving the creditor [Plaintiffs], (4) who justifiably relied on the representation, which (5) proximately caused the creditor [Plaintiff] damage.

In re Treadwell, 637 F.3d 855, 860 (8th Cir. 2011); Thul v. Ophaug (In re Ophaug), 827 F.2d 340, 342 (8th Cir. 1987); Vinson v. Cozart (In re Cozart), 417 B.R. 116, 125 (Bankr. W.D. Ark. 2009).

The Plaintiffs allege in their complaint and in their brief that the judgment rendered in favor of Plaintiffs against the Debtor and Elite Homes of Arkansas, Inc., in the Circuit Court of Saline County, establishes the requisite findings of fraud for purposes of 11 U.S.C. § 523(a)(2)(A) and that decision is binding on this Court under the principle of res judicata and, therefore, the Court need not inquire further. However, the Plaintiffs are confusing the doctrine of res judicata with the doctrine of collateral estoppel and neither doctrine applies in this case. In the case of Lovell v. Mixon, 719 F.2d 1374, 1376 (8th Cir. 1983), the Eighth Circuit Court of Appeals explained the difference:

> Under the doctrine of collateral estoppel, four criteria must be met before a determination is conclusive in a subsequent proceeding: (1) the issue sought to be precluded must be same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. In re Piper Aircraft Distribution System Antitrust Litigation, 551 F.2d 213 (8th Cir. 1977). The doctrine of res judicata bars a later suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies. Ward v. Arkansas State Police, 653 F.2d 346 (8th Cir. 1981). Thus, the application of collateral estoppel or issue preclusion is limited to those matters previously at issue which were directly and necessarily adjudicated. Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In contrast, res judicata or claim preclusion bars the relitigation of issues which were actually litigated or which *could* have been litigated in the first suit. Federated Department Stores v. Moitie, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); Allen v. McCurry, 449 U.S. 90, 101 S.Ct.

411, 66 L.Ed.2d 308 (1980).

See also Brown v. Felson, 442 U.S. 127, 99 S.Ct. 2205 (1979); Canady v. Allstate Ins. Co., 282 F.3d 1005 (8th Cir. 2002)(overruled on other grounds). As Judge Richard Taylor explained, when dealing with issues of dischargeability res judicata does not apply because a state court does not have jurisdiction and cannot determine dischargeability of a debt in the state court action. Countrywide Home Loans, Inc. v. Blair (In re Blair), 324 B.R. 725, 731 (Bankr. W.D. Ark. 2000).

The doctrine of collateral estoppel has no application to this proceeding because it is impossible to determine from the state court proceeding the basis upon which the jury rendered its verdict. The Plaintiffs' claim of damages was submitted on four different legal theories which were negligence, breach of contract, breach of implied warranties, and deceptive trade practice. The jury verdict could have been against the Debtor on all of the four theories or any one of the four theories based on the instructions to the jury. (Pl. Ex. 1G & H.) The judgment did not allocate any portion of the total amount of damages to any particular theory. (Pl. Ex. 2.) The jury instruction never mentioned fraud except the instruction concerning the Plaintiffs' theory of deceptive trade practice. (Pl. Ex. 1G.) However, the jury did not have to find fraud to award damages; therefore, a determination of fraud was not essential to the judgment as is required by the doctrine of collateral estoppel. See Lovell v. Mixon, 719 F.2d 1374, 1396 (8th Cir. 1983). The theories of breach of contract or negligence alone, are not a basis for finding a debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). See Lindau v. Nelson (In re Nelson), 357 B.R. 508, 508 (B.A.P. 8th Cir. 2006); Rickabugh v. Rickabaugh (In re Rickabaugh), 355 B.R. 743, 758 (Bankr. N.D. Iowa 2006); Short v. Tainter (In re Tainter), 2002 WL 32115828 *3

10

(Bankr. E.D. Ark. 2002).  Thus, in establishing the element of misrepresentation, creditors may

not rely solely on a failure to fulfill a contract.  Leeb v. Guy (In re Guy), 101 B.R. 961, 978

(Bankr. N.D.Ind. 1998).  Also, evidence of negligence or shoddy workmanship does not establish

false representation with intent to deceive.  The fact that a debtor's negligence caused the debt is

insufficient to prove the type of fraud that is dischargeable under 11 U.S.C. § 523(a)(2)(A).

Leger v. Semora (In re Semora), 204 B.R. 26, 28 (Banrk. E.D. Ark. 1996); Rezin v. Barr (In re

Barr), 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996).

  The Plaintiff introduced evidence which they argue support the contention that the debt is

nondischargeable under the provisions of 11 U.S.C. § 523(a)(2)(A).  The Plaintiffs argue in their

brief that the Debtor made false misrepresentations with the intent to deceive concerning the

following:

  1.  The Debtor was insured for quality, i.e., a performance bond;

  2.  The Debtor misrepresented his age and experience;

  3.  The Debtor misrepresented that he would use a certain type of water proofing

    in the basement.

### A.

### WORKMANSHIP INSURANCE

  Sims testified that she asked the Debtor if he had insurance which would cover

workmanship and he responded that he did.  This testimony was corroborated by her friend,

Vivian Griffith.   In fact, according to Sims' testimony the issue of whether the Debtor had

workmanship insurance was one of the first issues she discussed with the Debtor even before she

had procured a set of plans.  (Tr. at 174.)  The Debtor denied that he ever made such a

representation.  Even though Sims testified she was immediately concerned that workmanship insurance be procured she failed to insist that this request be added to the written contract. The Debtor said he has never heard of workmanship insurance.  (Tr. at 357.)

Mark Pruitt, an independent insurance agent, testified for the Debtor.  He sold insurance to the Debtor in connection with his house construction business.  He stated the Debtor needed general liability and worker's compensation insurance for a home construction business and the Debtor purchased this type of insurance from his agency.  (Tr. at 300-301.)  He explained that a builder's risk insurance is like a homeowners policy and is purchased by whoever has taken out the loan.  During the course of construction it covers the dwelling itself as it is being built from the ground until it is completed and sold to the homeowner or converted to a homeowner policy.  (Tr. at 308.)

He also stated that "a lay person sometimes confuses insured and bonded, just because they've heard that advertised by people in the construction industry. . . .  Usually, bonding means that they're – they're allowed to get permits through a city or state requirement. . . .  Usually, it's - - bonds are required with larger construction jobs, commercial construction jobs.  I don't ever do them for residential, except for maybe city permit bonds."  (Tr. at 309-310.)

He stated performance bonds are typically for larger general contractors, "usually on schools, government jobs, or hospitals, and malls, and things like that, because of the size of the jobs.  Yeah, they require performance and payment or labor and materials bonds, to basically, to protect themselves in case a subcontractor, for whatever kind [sic], can't finish a job or leaves a job."  He testified that he had never issued a performance bond on a residential construction.  (Tr. at 318-319.)

12

Sims' testimony concerning insurance on the other hand, seemed confused.  She said the Debtor stated he already had builder's risk insurance (Tr. at 200), then she said she did not have to have builder's risk (Tr. at 202) because "Ryan had all the insurance that he was supposed to have." (Tr. at 201.)  She admitted she was not sure what a performance bond was nor was there any discussion with the Debtor about the cost.  (Tr. at 205.)  She said the requirement for workmanship insurance was not in the written contract but there was an oral agreement that he would carry this type of insurance.  (Tr. at 206-207.)  Sims' testimony about the workmanship insurance is not persuasive.  The only corroboration comes from the testimony of Sims' friend. The insurance agent testified that a performance bond is not used in home construction and Sims' never offered proof that "workmanship insurance" existed.  Sims testified that she never saw any insurance, that it went directly to her bank and since the bank never said anything to her, she just assumed they had all the required insurance. (Tr. at 207.)

Considering all of the testimony and exhibits on this issue, Sims has not established by preponderance of the evidence that the alleged misrepresentation about workmanship insurance was made either in an oral agreement or as part of the written contract.  Neither does the evidence established that any statement about insurance caused the Plaintiffs' damage.  The Plaintiffs' evidence established that the damage was the result of negligent and shoddy workmanship.  See Daniel v. Boyd (In re Boyd), 347 B.R. 349, 357 (Bankr. W.D. Ark. 2006) (rejecting claim by creditors that damage was caused by debtor's statement that he was bonded and licensed); Long v. Donley(In re Donley), 115 B.R. 502, 504 (Bankr. E.D. Pa. 1990)(commenting that evidence of negligent repair would not establish fraud).

13

B.

EXPERIENCE AND AGE

The Plaintiffs argue in their brief that the Debtor misrepresented his age and that the misrepresentation caused the damage claimed.  Sims testified that the first time that she met the Debtor she asked him how old he was and the Debtor replied, "either 26 or 27."  (Tr. at 174.) She said he also stated that he had built between 25 and 30 houses and that he had built houses in Chenal (an upscale neighborhood in Little Rock), and other places in the Central Arkansas area. (Tr. at 177.)  She said she relied on his representation that he had built houses in Chenal and other locations in Central Arkansas.

Sims stated that if the Debtor had told her he was only 21 when the contract was signed she would have never hired him and also it would have indicated to her that he had not built 25 or 30 houses because he would have had to start when he was 15 years old.  (Tr. at 197.)

Vivian Griffith also stated that when she first met the Debtor she stated, "You look like a baby. Have you built - - how many houses have you built?"  (Tr. at 67.)  She stated he replied he had built some houses in Chenal and that he led her to believe he built more than 20 expensive homes.  She said he told her was either 26 or 27 years old.  (Tr. at 67.)

The Debtor testified that he was born in 1984 which made him 22 in the fall of 2005 when the contract was signed.  The Debtor testified that by the time he met Sims he had worked on approximately 38 homes. (Tr. at 370.)  The Debtor does not recall being asked how old he was but stated that if she had asked, he would have told the truth.  (Tr. at 386.)  The Debtor testified that he understood the question, "How many houses have you built?" to mean how many have you worked on, such as framing a house.  (Tr. at 109 & 370.)

14

There is no proof that the Debtor did not work in some capacity on a number of houses approximating the number that he said that he worked on.  The problem here lies in the question, "How many houses have you built?"  The Debtor claims his definition of built is different from the Debtors.  Had the Debtor asked, "How many houses have been built where you were the general contractor?", a different answer would be required. It cannot be said that the Debtor made a statement that he knew was false regarding the number of houses he "built."

With regards to the Debtors age, there is a dispute in the testimony and there is not enough proof to say by a preponderance of the evidence that the Debtor told Sims he was 26 or 27.  The only evidence offered is the testimony of Sims and her friend that he said this and the Debtor's testimony that he did not. His age was never verified by Sims, she never asked to see his drivers license or require him to put his age in writing. Even if the Court believed the Debtor made this statement, it was not shown that she justifiably relied upon this statement or that the reliance caused the damage.

The evidence contained many examples of poor or negligent workmanship on Sims' home but the test is fraud and misrepresentation, not negligence or breach of contract.  The Plaintiffs have not proven by a preponderance of the evidence that the alleged misrepresentations were made and relied on by Sims causing her damage that resulted in the claim she seeks to have determined nondischargeable.

C.

BASEMENT WATERPROOFING

Sims testified that she wanted to use a waterproof product called bituthene in the basement.  In fact, she said she brought the subject up at her initial meeting with the Debtor.  (Tr.

15

at 173 & 179.)  She said bituthene is an expensive material and it actually was in the contract but it was on the missing page.  (Tr. at 190-191.)

The Plaintiff offered no testimony that the Debtor ever represented that he would use the material called bituthene, only that she wanted him to use it.  The Debtor stated he did talk with Sims about the product bituthene but not at the time he estimated the cost of the house.  (Tr. at 360 & 418.)  Since there was no evidence of any representation by the Debtor about bituthene, the Plaintiffs have failed to meet their burden of proof regarding this representation.

<u>IV.</u>

<u>11 U.S.C. § 727(a)(2)(A)</u>

The remaining allegations concern the alleged transfer of assets in violation of 11 U.S.C. § 727(a)(2).  This section provides in relevant part that:

> The court shall grant the debtor a discharge, unless–
> . . .
> (2)   the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated or concealed–
> (A) property of the debtor, within one year before the date of the filing of the petition.

The fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct.  <u>Devers v. Bank of Sheridan(In re Devers)</u>, 759 F.2d 751, 753 (9th Cir. 1985); <u>Ramsey v. Jones (In re Jones)</u>, 175 B.R. 994, 1004 (Bankr. E.D. Ark. 1994). Some of the circumstances indicating fraud may include the "badges of fraud" such as:

1.      The lack or inadequacy of consideration;

2.      The family, friendship or close associate relationship between the parties;

3.      The retention of possession, benefit or use of the property in question;

16

4.     The financial condition of the party sought to be charged both before and after the

transaction in question;

5.     The transfer was in anticipation of a pending suit.

 Emmett Valley Assoc. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir.

1992); Soloman v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2nd Cir. 1983).  The burden of

proof is on the objecting creditor, who must prove the necessary elements by a preponderance of

the evidence.  Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654 (1991); First Commercial Bank v.

Locke (In re Locke), 50 B.R. 443, 451 (Bankr. E.D. Ark. 1985).  However, once a creditor

introduces proof that the debtor committed any of the prohibited acts, the debtor has the burden

of coming forward to explain his conduct.  Jolles v. Freedman (In re Freedman), 693 F.2d 50, 51

(8th Cir. 1982); Ramsay v. Jones (In re Jones), 175 B.R. 994, 997 (Bankr. E.D. Ark. 1994).  The

denial of discharge under section 727 is a harsh sanction and, therefore, the provisions are strictly

construed in favor of the debtor.  Eggert v. Sendecky (In re Sendecky), 283 B.R. 760, 763

(B.A.P. 8th Cir. 2002); Daniel v. Boyd (In re Boyd), 347 B.R. 349, 353 (Bankr. W.D. Ark. 2006).

In 2009, the Debtor formed a corporation called Eighty Eight Cabinet Company.  (Pl. Ex.

3E & Tr. at 166-167.)  The company is a Subchapter S corporation and in 2010 the Debtor

owned 100% of the stock.  The company had about four or five employees and the Debtor was

president.  On September 6, 2011, the Debtor sold 270 shares of stock in Eighty Eight Cabinet

Company to Able Neal (Neal), for $2,500.00.  (Def. Ex. 3 & Tr. at 169.)  The sale represented

90% of the ownership of the corporation.  The sale occurred shortly after Sims obtained a

judgment against the Debtor in June 2011.  (Pl. Ex. 2.)  The Debtor stated that he sold the stock

to raise money to help pay for an appeal of the judgment in favor of Sims. The purchaser of the

17

stock, Neal, is an employee of Eighty Eight Cabinet Company and is still employed at the company in the same capacity as office manager.  (Tr. at 79.)

The Debtor admitted he is performing the same services he did before he sold 90% ownership of the company and that Neal's duties have not changed.  The Debtor remained president after Neal became the owner of the company and no board of directors met to vote the Debtor in a president.  Neal explained, "[i]t was just I left him as president."  (Tr. at 277.)  Neal stated that the Debtor's job duty as president is to manage the company.  (Tr. at 261.)

Neal is still paid $16.50 per hour which is what he received before the sale.  (Tr. at 153 & 392.)  Neal testified that he has worked at Eighty Eight Company for three to four years and his job is to produce cabinet parts for the other employees to assemble.  (Tr. at 260-261.)  Neal stated that in September of last year, the Debtor told him he had to raise some money quickly for attorneys' fees and that they talked about it and Neal agreed to give him $2,500.00 in exchange for 90% of the stock in Eighty Eight Cabinet Company.  (Tr. at 262.)  Neal wrote this check for $2,500.00 on his personal account.  (Tr. at 263; Def. Ex. 2).  A notation on the check states, "[t]oward purchase of co[mpany] stock."  (Def. Ex. 2).  Neal said the price of the corporation was based on the amount of equipment the company owned which he estimated to be $2,000.00 to $3,000.00.  (Tr. at 274.)  The Debtor stated that the purchase price in the amount of $2,500.00 was based on what his attorney said he needed.  (Tr. at 169 & 394.)

Neal did not do any due diligence before purchasing Debtor's stock.  (Tr. at 285.)  Neal does not know whether Eighty Eight Cabinet Company is a formal corporation.  (Tr. at 288.)  When asked if the company was a Subchapter S corporation, Neal stated he did now know what that was.  (Tr. at 274.)  Neal said he was the one who demanded the stock as a condition to

18

giving the Debtor $2,500.00.  Neal says he was aware of the judgment against the Debtor at the

time he purchased the company.  Neal stated the Debtor would be given a first option to buy the

stock if Neal decides to sell and if the Debtor refuses Neal can sell to someone else; however,

this agreement is not in writing.  (Tr. at 275.)

Neal received a payment of $1,000.00 from the company in June 2011 for repayment of a

loan, but stated it was for materials he had purchased and not repayment of the $2,500.00 loan to

the Debtor.  (Tr. at 267.)  However, no documents were introduced to corroborate the testimony.

The Debtor admitted he had a personal bank account until February 2011, which was the

same month the trial in state court was commenced.  (Tr. at 95.)  Thereafter, he has paid personal

expenses with the company debit card.  The Debtor does not receive a regular salary or draw;

however, he is compensated for managing the company.  (Tr. at 119-120 & 132.)  He uses the

company debit card to purchase items at the grocery store, items from department stores, meals at

restaurants, charges at Oaklawn (race track in Hot Springs, Arkansas), and other personal items.

(Tr. at 121 & 123-124.)  The company pays $640.00 a month for his "company vehicle" which is

titled in the Debtor's name, listed on the Debtor's bankruptcy petition, and used by the Debtor for

personal use.  The company also pays his electric, cell phone, and cable bills, and other personal

living expenses.  (Tr. at 123-125.)  On average, the Debtor estimates he draws about $1,700.00

per month from the company.  (Tr. at 147.)

Neal admitted that he had no idea how much the Debtor took out of the company to pay

his living expenses over the last year.  (Tr. at 279.)  Neal also said no other employees were paid

in this fashion.  Neal could not explain why Debtor is paid in the manner in which he is paid.

The Debtor said he does not have a salary because he is trying to build the business up.  (Tr. at

383.)

The Debtor stated that selling his company to obtain $2,500.00 was not his first choice. The Debtor admitted that he made regular draws from the company for personal expenses and regularly borrowed money for company expenses from Nancy McNew. The Debtor had an arrangement with Nancy McNew, the office manager's wife, whereby she would advance money to the company to purchase items and then the company would pay her back with ten percent interest. (Tr. at 81, 417, 424.) The year prior to bankruptcy she had advanced a total of about $95,000.00 to the company that the Debtor would classify as for job related expenses. (Tr. at 126-127, 131.) He admitted her loans could be risky because there was a chance his customers would not pay for the cabinets the materials were purchased for. (Tr. at 393.) Her loan ranged from $500.00 to as much as $11,000.00. (Tr. at 129 & 417.) When asked why he did not borrow the $2,500.00 from Nancy McNew, he testified that, "it wasn't a loan. I wasn't seeking a loan for that. She wasn't interested in - - in offering a loan for those basis. " (Tr. at 392.)

There was a balance of $7,901.40 in the Eighty Eight Cabinet Company account on the day the Debtor sold the company. (Pl. Ex. 8.) The company made deposits in the total amount of $62,987.32 during that month. (Pl. Ex. 8.) According to the Debtor, he could not draw the $2,500.00 needed because "there wasn't enough allocated funds to do such." (Tr. at 407.) This is the same account that the Debtor used to pay his living expenses.

Based on the evidence presented, Sims has established that the transfer of the stock in Eighty Eight Cabinet Company was made with fraudulent intent to defraud Sims and that it was made within one year of the petition date. The evidence is convincing that there does not appear to have been a bona fide transfer at all. Rather, it was merely a sham. The consideration of

20

$2,500.00 was not based on any meaningful effort to determine the value of the stock transferred. The transaction was between an employer and an employee who allegedly were trading places in the business hierarchy yet neither the buyer and seller's duties were changed and the Debtor now reduced to a 10% minority shareholder remained the active president while the new alleged owner continues to work for hourly wages. In short, the Debtor did not appear to give up anything as a result of the conveyance. The Debtor does not draw a regular salary and is using the business account as his personal bank account without any supervision of input from the owner. The advantage of this, of course, is that it avoids Sims' collection effort on her judgment. Both parties were aware of the judgment recently obtained by Sims at the time of the transfer. The Debtor owned no other substantial asset except for the property transferred. The irony is, of course, that had the Debtor simply filed a Chapter 7 bankruptcy petition when the judgment was awarded he could have, as it turns out, discharged the debt, kept his stock as exempt property and obtained his fresh start. The fresh start, however, is only available for the honest, but unfortunate debtor. See Grogan v. Garner, 498 U.S. 279, 286-287, 111 S.Ct. 654, 659 (1991); Sanchez v. Northwest Airlines, Inc., 659 F.3d 671, 674 (8th Cir. 2001).

Therefore, for the reasons stated, the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(2)(A).

IT IS SO ORDERED.

Dated:   06/12/2013

_____
HON. JAMES G. MIXON
UNITED STATES BANKRUPTCY JUDGE

DATE:_____

cc:   David Carl Hawkey, Esq.
       Phyllis M. Jones, Esq.
       Laura R. Westbrook, Esq.

22